[Crim. No. 2212. First Dist., Div. One. June 25, 1943.]

THE PEOPLE, Respondent, v. SAMUEL ADAMS DARCY, Appellant.

Andersen & Resner, George R. Andersen, Herbert Resner and Charles J. Katz for Appellant.

Robert W. Kenny, Attorney General, David K. Lener, John F. Hassler, Deputies Attorney General, Matthew Brady, District Attorney, and Leslie C. Gillen, Assistant District Attorney, for Respondent.

WARD, J.—Appellant was indicted, tried by a jury and convicted of perjury. The indictment contains one count which alleges in substance that on March 27, 1934, in an affidavit of registration as an elector he stated under oath before a deputy registrar of voters authorized to administer oaths in the department of elections at San Francisco that his name was "Sam Darcy" and his place of birth "New York," whereas his true name is Samuel Dardeck or Samuel Adams Dardeck and his place of birth Ukraine, Russia.

A demurrer and supplement to demurrer to the indictment were overruled; a motion to dismiss the indictment and a motion to quash the same were dismissed, and a challenge to the jury panel was disallowed. Upon the return of the verdict, motions in arrest of judgment and for a new trial were made and denied, whereupon a motion for probation was made and granted, and the pronouncement of judgment suspended.

Appellant did not testify in his own behalf. However, as appears from testimony given by him before the Immigration and Naturalization Service at Ellis Island, New York, he was born in Orinion, Russia, and given the name of Srool Adam Dardeck. With his brothers and sisters he was brought to the United States by his mother, his father having emigrated to this country a year earlier. The latter secured naturalization and it is by reason of this fact that appellant as a minor child acquired his citizenship. He was married in New York in 1926 under the name of Samuel Adams Darcy; in 1927 he remarried his wife in Chicago under the name of Samuel Adams Dardeck. In the same year, he applied for passports to Europe for himself and his wife whom he stated he "married on May 13, 1927," his application stating under oath that his name was Samuel Adams Dardeck and that he had been born in Russia. In 1932 in connection with an interview with an inspector of the police department of Long Beach to establish his identity, he signed the name of Sam Darcy to a written statement that he was born in New York. Affidavits, also, made by him in 1931, 1932 and 1934 before the registrar of voters in San Francisco gave his name as Samuel Adams Darcy, Samuel Darcy and Sam Darcy, respectively, and his birthplace as New York. In 1934, also, he filed under oath a declaration of candidacy for the office of governor of this state. Among other things he stated in the declaration that he had been a resident of this state for eight and a half years. In 1935, he again applied for a passport to Europe,

his application referring to the 1927 passport and giving his birthplace as Ukraine, Russia. Also, in 1935, he testified before the naturalization and immigration service that his name was Samuel Adams Darcy; that he was known in California as Sam Darcy and Samuel Adams Darcy; that his address at the time was Jersey City and that he had used this address for several years for personal business, but he was a registered voter in San Francisco. At this time he again gave his birthplace as Ukraine, Russia.

At about the time of the filing of the indictment against appellant by the grand jury, he left this state and went to the State of Pennsylvania, where, on September 19, 1939, he was apprehended and extradition proceedings instituted against him. He resisted these proceedings by resort to the federal courts, without success, and was returned to this state to stand trial.

At his trial he exercised his legal right not to testify. Evidence offered and received on his behalf tended to prove that during his several years residence in this state he commonly used and was known by the name of Sam Darcy; that he followed the calling of journalist and political writer, advocating the principles of the communist party, and was on one occasion the candidate of that party for the office of mayor of San Francisco, and on another, as stated, for that of governor of the state. It is not contended that he used that name for any fraudulent purpose.

Appellant urges various grounds for reversal, namely (1) that the indictment fails to charge the offense of perjury inasmuch as the alleged false statements were immaterial to the proceeding in which they were made; (2) that the making of them was not legally proven, since the record disclosed no willfulness or criminal intent, and was not established by the testimony of two witnesses, or of one witness and proof of corroborating circumstances; (3) that the prosecution failed to confront the appellant with necessary witnesses, namely, his father (whose record of naturalization was used to establish appellant's birth in Russia), and the deputy registrar in San Francisco (before whom the alleged false statements were made—and who at the time of the trial was no longer living); (4) the erroneous admission or exclusion of evidence, and (5) that by his prosecution and conviction he was denied the equal protection of the law.

The appeal purports to be taken from the judgment

and the order denying the motion for a new trial; it is treated and referred to in the briefs of appellant as an appeal from the verdict. It is not in fact such. (*People* v. *Allen,* 19 Cal. App.2d 301 [65 P.2d 382]; *People* v. *Boles,* 35 Cal.App.2d 461 [95 P.2d 949]; *People* v. *Richardson,* 23 Cal.App.2d 428 [73 P.2d 610]; *People* v. *Arrangoiz,* 24 Cal.App.2d 116 [74 P.2d 789].) Judgment was not pronounced; it was suspended, and the defendant on his motion placed on probation. Under such circumstances, it is not necessary to consider the appeal as applying to a judgment or verdict (*In re Phillips,* 17 Cal.2d 55 [109 P.2d 344]; *People* v. *Marconi,* 118 Cal.App. 683 [5 P.2d 974]); the appeal from the order denying appellant's motion for a new trial remains unaffected. (Penal Code, sec. 1237; *People* v. *Johnston,* 37 Cal.App.2d 606 [100 P.2d 307].) An attack upon an indictment, or alleged irregularities occurring before issue of fact joined by plea are not properly matters to be determined on an appeal from an order denying a motion for a new trial. (*People* v. *Duncan,* 50 Cal.App.2d 184 [122 P.2d 587]; *People* v. *Turner,* 39 Cal. 370), but lack of jurisdiction if disclosed by the pleadings may be raised at any time. The indictment on its face shows the jurisdiction of the court over the defendant for the alleged offense. Any objections relative to extradition proceedings or to the sufficiency of the indictment, upon the ground that certain alleged false statements were immaterial, etc., may not, in view of the necessity of dismissing the appeal from the purported judgment, be considered as an attack upon the indictment. However, the materiality of the alleged statements as presented in evidence will be considered.

 The falsity of evidence upon which it is sought to establish perjury must be proved by two witnesses, or by one witness and corroborating circumstances. (Pen. Code, sec. 1103a.) The affidavit containing the perjurious matter was introduced through a deputy registrar of voters. The particular officer who administered the oath to appellant was no longer living at the time of the trial. The deputy witness testified to the official position, and to his familiarity with the signature, of the deceased deputy. Other documents containing the identified signature of "Sam Darcy," including a declaration of candidacy for governor, were also admitted in evidence.

To prove the falsity of the statement in appellant's registration affidavit, the naturalization papers of his father, which

had also been made a part of the applications for passports, and which showed the name of Dardeck and gave a place of birth different from the affidavit, were introduced. Several applications for passports, signed by appellant under oath and showing a different name and his place of birth as Russia instead of New York, were marked as exhibits. Statements made by him to an immigration inspector in the presence of a special agent of the Department of State of the Government of the United States contained the following: ''Q. Have you at any time registered in the State of California or elsewhere as having been born at New York? A. I don't think so. My recollection is that I didn't register as being born in New York, the fact is that I was not born there so why should I register that way. Q. Of what country are you a citizen? A. The United States. Q. How do you claim United States citizenship, on what grounds? A. Upon my father's citizenship papers.'' The foregoing testimony standing alone more than fulfills the requirements of section 1103a, Penal Code, that perjury may be proved by one witness and corroborating circumstances. (*People* v. *Todd*, 9 Cal.App.2d 237 [49 P.2d 611]; *People* v. *Curtis*, 36 Cal.App.2d 306 [98 P.2d 228]; *People* v. *Tinnin*, 136 Cal.App. 301 [28 P.2d 951]; *People* v. *Davis*, 210 Cal. 540 [293 P. 32]; *People* v. *Gray*, 52 Cal.App. 2d 620 [127 P.2d 72]; *People* v. *Pustau*, 39 Cal.App.2d 407 [103 P.2d 224].)

A false statement must be material to the matter at issue and must be made willfully. (Penal Code, sec. 118.) By this section defining perjury, the word ''willfully'' is used in the sense of knowingly or intentionally and should be differentiated from the same word when used in an indictment charging a fraudulent purpose. To sustain a perjury charge it is not necessary that the false statement be made for the purpose of injuring another. From the evidence as recounted the jury could easily conclude, to a moral certainty and beyond reasonable doubt, that the statements in the affidavit of registration were made ''willfully.'' Whether a false statement has been made willfully or as the result of an honest mistake is a question of fact solely for the jury to decide. (*People* v. *Todd*, *supra*.)

Contrary to the contention of appellant that he was an elector, entitled to vote irrespective of whether he was born in Russia or New York, the statements assigned as perjurious were material as a matter of law. The words ''elector''

and "voter" are often used interchangeably but there is a difference in meaning. An elector is one who has the qualifications to vote but may not have complied with the legal requirements, that is, the conditions precedent to the exercise of his right to vote. An elector possessed of the necessary constitutional and statutory qualifications is entitled to hold office though his name is not on the great register of voters. (*Bergevin* v. *Curtz*, 127 Cal. 86 [59 P. 312].) Appellant argues that if the holding in the Bergevin case is correct, it is immaterial whether he made false statements as to his name and place of birth since he could have accomplished the same result by registering under his real name and giving his correct place of birth.

Under appellant's analysis, if the person who makes the affidavit actually has the qualifications to vote, it is immaterial whether or not his answers under oath be truthful. Following his theory a person could register under an assumed name and give a false place of birth, and not be subject to a charge of perjury. Information required in registration is material, its purpose being to make sure that only qualified persons register and vote. It is to effect this purpose that such information is required to be given under oath, and it serves as a basis for an investigation of qualifications of a person who registers. Citizenship is a material factor in the right to register, and subsequently to vote. If registrants were permitted to make false statements of the type herein with impunity, election frauds would be furthered. One person could register several times giving different names and places of birth, or varying statements of the basis of his right to vote.

The test in a perjury charge is not that injury actually occurred as a result of the false statements, but that the falsehoods could have influenced or changed the status of the subject of the statement to the benefit of the falsifier or the detriment of others. It is sufficiently material if it might have affected the proceeding in or for which it was made. (Pen. Code, sec. 123; *People* v. *Pustau, supra.*) In the present instance the Registrar of the City and County of San Francisco was prevented from examining the father's naturalization papers for the purpose of verifying appellant's citizenship, and appellant was benefited at least to the extent of eliminating delay in the determination of that question, or trouble and possible embarrassment in explaining the names given or assumed by him.

The law views with abhorrence the use of falsehoods to such an extent that it is no defense to a prosecution for perjury that the oath was administered in an irregular manner. (Pen. Code, sec. 121.) A person who, being required by law to make a statement under oath, willfully and knowingly falsifies such statement, purportedly made under oath, in any particular, is guilty of perjury as a matter of law whether or not the oath was in fact taken (sec. 129), and regardless of whether the maker knew the materiality of the falsehood (sec. 123), and the offense is complete upon delivery of the affidavit to another person, with the intent that it be uttered or published as true (sec. 124).

It is conceded that appellant did not by legal proceeding change his name from Dardeck to Darcy. The name Darcy was a name particularly assumed by him when in California. Generally in Russia and in New York he went by the name of Dardeck. ■ Appellant contends that a change of name does not necessarily involve a legal proceeding; that one may adopt a name by using it. This method seems to have been approved under certain conditions and stations in life but the change should be with reference to "all affairs." (*Ray* v. *American Photo Player Co.*, 46 Cal.App. 311 [189 P. 130]; *In re Useldinger*, 35 Cal.App.2d 723 [96 P.2d 958].) Usage has sanctioned an assumed business or so-called "stage" name. In some instances, such as in applications for passports the assumed name must be discarded for the original or true name. In registering in California, the "full name," including christian or given, and middle name, if any, is required. The place of birth or method of acquiring citizenship should be underlined in the affidavit. The necessity and materiality of giving the true name when registering as a voter has heretofore been considered. In addition it is required that when the last name has been changed by order of court or by marriage, a notation of such fact shall be made upon re-registration. (Pol. Code, sec. 1097.) An assumed name is in fact a false name. In requiring the name and place of birth it was never contemplated by the statute that false information should be given.

■ Since willfulness in the making of the statements was a material issue, affidavits showing birth in a place other than New York were relevant. Other registration affidavits were admissible to show intent.

■ The rule of right of confrontation has no application to documentary evidence. The claim that prejudicial error

was committed in failing to produce the deceased deputy registrar as a witness needs no comment. Perhaps it would have been well, if possible, to have produced the father of appellant, or to have made a showing of an effort to produce him. However, the method of the father's naturalization was made a part of appellant's application for passport. If there was error in this regard, it was trivial and not prejudicial.

■ Appellant contends that the effect of an amendment to section 1094 of the Political Code was to declare a general amnesty for all perjurious statements in registration affidavits. In substance the amendment provides that on a specified date all affidavits of registration should be cancelled for all purposes. This section was adopted in connection with a permanent registration, the main purpose being to prevent old registrations being used for voting purposes. "Cancelled for all purposes" simply means for purposes pertaining to future voting; it certainly was not intended to forgive prior crimes of perjury. (*Kerr* v. *Russell*, 4 Cal.2d 634 [51 P.2d 1095].) Appellant's interpretation is answered by the provisions of Political Code section 329 as follows: "The repeal of any law creating a criminal offense does not constitute a bar to the indictment or information and punishment of an act already committed in violation of the law so repealed, unless the intention to bar such indictment or information and punishment is expressly declared in the repealing act." There is no express declaration in the amendment cancelling criminal liability. (*People* v. *Barton*, 48 Cal.App.2d 565 [119 P.2d 952].)

■ Finally it is contended that appellant's conviction constituted a denial of the equal protection of the laws of the United States and of the State of California in that he was singled out for prosecution for the sole reason that he is a communist. An offer was made to show, through certain county clerk assistants and deputy registrars, that hundreds of untruths pertaining to place of birth, etc., appeared in the records of the city and county of San Francisco and elsewhere in the state. At one time appellant offered to show "hundreds of thousands of similar and identical errors in registration" in San Francisco; that in many instances registrants voluntarily or upon notice had corrected the affidavits, and that the only prosecution instituted was against him. He further offered to prove that the police department and the District Attorney of the City and County of San Fran-

cisco had singled him out because "he is a communist." The district attorney, under subpoena, was in the court room but was not sworn as a witness. The record does not disclose that any member in authority of the police department was called as a witness in respect to this matter, or that anyone from that department with any knowledge upon the subject was ever subpoenaed. There is no evidence to show that any city and county or state official ever signed a complaint before a magistrate or otherwise alleging perjury against appellant. He was prosecuted by indictment. There was no offer to prove that the grand jury had singled him out because he is a communist, or that any member of the police department or the district attorney had persuaded or instigated the investigation by the grand jury or the return of the indictment. In those respects the offer of proof was insufficient.

█ Assuming that any part of the offer was sufficient to support appellant's contention, we will consider the case of *Yick Wo* v. *Hopkins*, 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220] relied upon by him. In that case an ordinance of the city and county of San Francisco required persons operating laundries in wooden buildings to obtain licenses. The petitioner was convicted of operating such a business without one. It appeared that licenses had been refused to all Chinese but had been granted to Caucasians. The court released the petitioner upon the ground that the administration of the ordinance violated the provisions of the constitution in that it made an arbitrary and unjust discrimination, based solely on the question of race, between persons otherwise similarly situated.

The facts and the law are not analogous. If appellant herein, otherwise legally entitled to register, had been refused such privilege solely upon the ground that he was a member of a designated political party, or that he professed a certain creed, or that he was of another than the white race, and subsequently appellant voted or attempted to vote and was prosecuted and convicted therefor, the Yick Wo case might be of some assistance to him. If Yick Wo had made false statements in his application for a license to operate a laundry, and had been charged with perjury in connection therewith instead of with operating such business without a license, a holding that he could make such statements with impunity is inconceivable. The maladministration of the licensing power was the prime reason for the release of Yick Wo. In that case, referring to the ordinance, the court said (p. 373):

"For the cases present the ordinances in actual operation, and the facts shown establish an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion, that, whatever may have been the intent of the ordinances as adopted, they are applied by the public authorities charged with their administration, and thus representing the State itself, with a mind so unequal and oppressive as to amount to a practical denial by the State of that equal protection of the laws which is secured to the petitioners, as to all other persons, by the broad and benign provisions of the Fourteenth Amendment to the Constitution of the United States." In *Ah Sin* v. *Wittman*, 198 U.S. 500 [25 S.Ct. 756, 49 L.Ed. 1142], a gambling case, the court refused to follow the ruling in the Yick Wo case, taking care to differentiate the facts.

Appellant sought to inject a false issue into the trial of the charge, which, if approved, could easily lead to a rule that if some guilty persons escape, others who are apprehended should not be prosecuted. There was no denial of the use of the assumed name and the false designation of place of nativity. Among other defenses appellant sought, by way of offer of proof, an acquittal upon the claim that others equally guilty had not been prosecuted and that he had been prosecuted because he is a communist. The first claim would be equally meritorious if presented in connection with a traffic violation, and the second would establish a precedent that nationality, race or creed might be used in all criminal cases as a defense. Both claims would simply cloud the real issue. The basis of the claim in the Yick Wo case was not that petitioner therein had been *arrested* because he was Chinese, but that he had been *refused a license* on account of his nationality. There was an apparent scheme or plan to keep Chinese from operating laundries. Attention has not been called to any offer of proof indicating that there was a scheme to prohibit communists from registering. California has recently been presented with a similar theory as developed by the appellants in *People* v. *Montgomery*, 47 Cal.App.2d 1 [117 P.2d 437]. In that case it was held that the decision in the Yick Wo case does not endorse the proposition that one charged with crime may justly complain because others who have committed the same offense, and are known to the authorities, are not brought to trial. The court said there was an obvious distinction between extending protection to persons of Chi-

nese nationality, in pursuit of the harmless and somewhat necessary business of laundering, and the extension of a like protection to those engaged in the vicious social evil of pandering. Whatever may be said relative to the proposed defense in a pandering charge may certainly with equal propriety be said of the offense of perjury, a crime per se.

The purported appeal from the judgment is dismissed. The order denying the motion for a new trial is affirmed.

Knight, J., concurred.

PETERS, P. J.—I dissent.

This appellant has been found guilty of perjury. The alleged perjury consists in the charge that in his affidavit of registration he gave his name as Sam Darcy when his true name is alleged to be Samuel Dardeck, and that he gave his place of birth as New York, when, in fact, it was Russia. This, the lower court held to be perjury, although the evidence admittedly shows that appellant possessed all of the requirements of an elector, and was legally entitled to register as a voter. In other words, the statements found to have been false in no way impaired the purity of the ballot, in no way qualified an otherwise incompetent elector, and in no way gave the franchise to a person not entitled to it. For this offense appellant has been found guilty of perjury for which he could have been subjected to imprisonment for a maximum period of fourteen years. (Pen. Code, sec. 126.) It is my opinion that the evidence, as a matter of law, is insufficient to support the conviction.

The evidence, on the name issue, showed the following: At birth appellant was named Srool Adam Dardeck. From his earliest youth he was called Samuel or Sam, and sometimes used the middle name of Adams. For many years, in California and elsewhere, he was known as Sam Darcy. He married under that name in 1926 and the next year was remarried under the name Dardeck. Several applications for passports were secured under the name Dardeck. In California, where he took an active part in political affairs, he was always known as Sam Darcy. He was a candidate for mayor of San Francisco in 1931, and was the Communist candidate for Governor in this state in 1934. Both candidacies were under the name Sam Darcy. He wrote political pamphlets and lectured under that name. The evidence is undisputed that in this state he was always known as Sam Darcy, but that in his dealings

with the federal government in connection with passports he used his birth name of Dardeck.

It seems to be the theory of the majority opinion that the use of other than a birth name in registering, unless a change in name is confirmed by court decree, as a matter of law, constitutes the crime of perjury. That is not the law. Under the common law rule, where it is not done for a fraudulent purpose, a person may lawfully change his name without resort to legal proceedings. (See cases collected 45 C.J. p. 381, sec. 15; 38 Am.Jur. p. 610, sec. 28.) A statute such as exists in this state providing a statutory proceeding for securing court approval of a change of name, as long as the statute does not provide that the statutory method is exclusive (and the statute of this state does not so provide), in no way affects this rule. Such statute is in aid of the common law rule. As long as it is not done for a fraudulent purpose, a man may change his name without resort to the courts, and the name so assumed becomes his legal name. (*In re Ross,* 8 Cal.2d 608 [67 P.2d 94, 110 A.L.R. 217]; *Emery* v. *Kipp,* 154 Cal. 83 [97 P. 17, 129 Am.St.Rep. 141, 16 Ann.Cas. 792, 19 L.R.A.N.S. 983]; *In re Useldinger,* 35 Cal.App.2d 723 [96 P.2d 958]; *Ray* v. *American Photo Player Co.,* 46 Cal.App. 311 [189 P. 130]; *Everett* v. *Standard Acc. Ins. Co.,* 45 Cal.App. 332 [187 P. 996]; for cases from other states see 45 C.J. p. 382, fn. 86; 38 Am.Jur. p. 610, sec. 28; annotations 110 A.L.R. 219; 2 L.R.A.N.S. 1089; L.R.A.1915D, 982; 14 L.R.A. 692.)

In the instant case there was neither charge nor evidence that appellant used the name Darcy for any false, fraudulent or criminal purpose. This is admitted by respondent. The evidence is uncontradicted that in this state he had never been known by any other name. The fact that he occasionally used his birth name of Dardeck in his passport applications in no way detracts from the fact that he was generally known as Darcy. In view of the fact that his citizenship was dependent upon the naturalization of his father, it is obvious he had to use such name in such applications, because, otherwise, there would have been no record of his citizenship. In this state appellant's name was legally Darcy, and no crime was committed by registering under that name.

The second charge is that appellant falsely averred he was born in New York, when, in fact, he was born in Russia. It may be conceded that the evidence supports the finding that this statement was wilfully false. This, however, does not

make it perjurious. In order to be perjury the false statement must be material. (Sec. 118, Pen. Code.) The material issue in an affidavit of registration is whether the registrant has the right to vote. Under the Constitution and laws of this state, citizenship, age and residence are the three main requisites for an elector. Electors possessing those qualifications may lawfully register, and, if registered, may vote. The object of registration laws is to prevent unqualified persons from voting. (*Bergevin* v. *Curtz*, 127 Cal. 86 [59 P. 312]; *Welch* v. *Williams*, 96 Cal. 365 [31 P. 222].) Such laws are aimed at preserving the purity of the ballot box and are not aimed at preventing a qualified elector from voting. They are for the purpose of preventing fraudulent voting. (*Attorney General* v. *Detroit*, 78 Mich. 545 [44 N.W. 388, 18 Am.St. Rep. 458, 7 L.R.A. 99].) The registration laws are not intended to act as a trap for a qualified elector, so that for minor discrepancies he is either to be deprived of the right to vote or subjected to a trial for perjury. Neither in the majority opinion nor in the brief of the attorney general is one case cited (and I have found none) where a conviction for perjury has been sustained for a misstatement in an affidavit of registration where, in fact, the registrant was qualified to vote. Darcy was admittedly a qualified elector. He was lawfully entitled to register. He was a citizen. At most, his registration was a faulty one that could have been canceled or corrected. (Sec. 300, Elec. Code, superseding sec. 1109, Pol. Code.) The election law provides sufficient penalties for faulty registration. Under section 300 of the Elections Code any person may proceed by action to cancel an illegal registration, while under section 139 of that code (old sec. 42a, Pen. Code) every person who allows himself to be registered "knowing himself . . . not to be entitled to registration" is subject to imprisonment for a maximum of three years. It is inconceivable that the Legislature intended that a faulty registration of a qualified person should constitute perjury with a maximum punishment of fourteen years when a deliberate illegal registration by an unqualified person should only be punished by three years maximum. It was never the purpose of the perjury statute to permit prosecutions on matters not material to the purpose of the affidavit. The affidavit signed by appellant required him, among other things, to answer as to his occupation and his height. If he had incorrectly designated his occupation, or his height, being qualified to

register, could he be subjected to the penalties of perjury? Obviously, it was never the intent or purpose of the perjury statute to include such immaterial misstatements. The only material misstatements that could constitute perjury are those in relation to the qualifications set forth for a qualified elector in section 1, article II of the Constitution. That section requires that the registrant be twenty-one years of age, a citizen for at least ninety days, a resident of the state for one year and of the county for ninety days, and of the precinct forty days. There was no false statement as to any of these matters. Darcy was a citizen and had the necessary residential requirements. The material fact was that Darcy was a citizen, not how he acquired citizenship. (See, *Leavine* v. *State*, 101 Fla. 1370 [133 So. 870].) The cases in this state properly have been very strict in requiring the false statement to be material to the specific inquiry before a conviction for perjury will be sustained. Thus, although testimony in an action may be false and wilfully false, it is not perjurious if it relates to collateral matters. (*People* v. *Ah Sing*, 95 Cal. 657 [30 P. 797]; *People* v. *Jones*, 123 Cal. 299 [55 P. 992]; *People* v. *Perazzo*, 64 Cal. 106 [28 P. 62]; *People* v. *McDermott*, 8 Cal. 288, *People* v. *Planer*, 23 Cal.App.2d 251 [72 P.2d 767].)

The attorney general argues that false statements as to place of birth could be used for a fraudulent purpose by an unqualified person to qualify himself as a voter. That is not the test. The test is whether this false statement was material to the matter then in issue—i. e., the legal right of Sam Darcy to register. We are not interested in what might be done by some fraudulent person. If a fraudulent act is committed, so that an unqualified person apparently qualifies as a voter by means of a fraudulent affidavit, he may be punished for perjury or for the offense defined in section 139 of the Elections Code. Because someone might be guilty because of fraud is weak ground indeed to justify a conviction of Darcy where fraud was admittedly not present.

As part of his defense appellant urged that by this prosecution he was denied the equal protection of the laws in violation of the federal and state Constitutions. All evidence offered by him on this issue was refused admission. Appellant thereupon offered to prove, through various public officials, the following: That various designated persons in San Francisco had registered to vote at various times, and that their affidavits contained false statements similar to the one here

involved, but that such persons had not been prosecuted; that the records of the Justice's, Municipal and Superior Courts of San Francisco show that never in the history of those courts had a person ever been prosecuted in California for perjury, or otherwise, for filing a false affidavit where the person was, in fact, a qualified elector; that there are thousands of registration affidavits on file in San Francisco showing errors, false statements and fraudulent statements, and that there never has been a prosecution in San Francisco of any qualified elector for such mistake or false statement; that the custom of the registrar's office, when such mistakes have been discovered, has been to send postcards to registrants informing them to come in and correct their affidavits; that in examining 2% of the total registrations in San Francisco 600 mistakes similar to the ones here charged, were discovered. Through the Assistant Attorney General of California he offered to prove that the records of the attorney general for twenty years showed no such prosecution in California; that the attorney general in 1934 instituted an injunction suit in Los Angeles (culminating in *Pierce* v. *Superior Court*, 1 Cal. 2d 759 [37 P.2d 453, 460]) seeking to cancel thousands of registration affidavits on the ground they were false and fictitious, but that not one of the persons accused of such false registration was ever criminally prosecuted. In fact, not one registration was even canceled. Through this witness and the district attorney he offered to prove that the only reason Darcy was singled out and prosecuted, although he possessed all the qualifications of an elector, was that he was a communist. Some color is given to these charges of discrimination when it is remembered that the prosecuting officials extradited this defendant from Pennsylvania in order to try him on this indictment, when, according to the offers of proof, there were then thousands of affidavits of registration on file in San Francisco containing false statements similar to the one here involved. None of these local false registrants, according to the offer of proof, was ever prosecuted.

It is, of course, the law that a person committing a crime cannot claim an unlawful discrimination upon a mere showing that other persons or classes of persons have committed the same offense and have not been prosecuted therefor. The cases cited in the majority opinion clearly and properly establish that principle. But where that fact is shown plus an arbitrary, intentional and deliberate discriminatory intent on the part of the law enforcement officers, a different problem is

presented. In such case, an accused has made out a case of denial of equal protection. The principle was stated in *Yick Wo* v. *Hopkins*, 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220], where an ordinance admittedly fair on its face and making a violation a crime was so administered that only Chinese were prosecuted under it. The court (p. 373) stated: ". . . the facts shown establish an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion, that, whatever may have been the intent of the ordinances as adopted, they are applied by the public authorities charged with their administration, and thus representing the State itself, with a mind so unequal and oppressive as to amount to a practical denial by the State of that equal protection of the laws which is secured to the petitioners, as to all other persons, by the broad and benign provisions of the Fourteenth Amendment to the Constitution of the United States. Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution. . . . The fact of this discrimination is admitted. No reason for it is shown, and the conclusion cannot be resisted, that no reason for it exists except hostility to the race and nationality to which the petitioners belong, and which in the eye of the law is not justified. The discrimination is, therefore, illegal, and the public administration which enforces it is a denial of the equal protection of the laws and a violation of the Fourteenth Amendment of the Constitution." The principle of this case has been reaffirmed in *Williams* v. *Mississippi*, 170 U. S. 213 [18 S.Ct. 583, 42 L.Ed. 1012]; *Ah Sin* v. *Wittman*, 198 U.S. 500 [25 S.Ct. 756, 49 L.Ed. 1142]; *Mackay Telegraph & Co.* v. *Little Rock*, 250 U.S. 94 [39 S.Ct. 428, 63 L.Ed. 863].

The rule of these cases is sound. The basic principle of our system of government is that all people, including the weak, the outnumbered and the nonconformist, stand before the courts on a basis of equality with all other litigants. If the criminal processes can be deliberately and intentionally abused to prosecute a particular individual because he is a communist, not because of what he has done, but because of his beliefs, the fundamental cause for which we are now fighting a great war becomes a hollow mockery. The protecting

arm of the Fourteenth Amendment prohibits prosecutions based on prejudice and persecution. Mr. Justice Black expressed this thought in *Chambers* v. *Florida,* 309 U.S. 227 [60 S.Ct. 472, 84 L.Ed. 716], where, in reference to the discriminatory practices there involved, he stated (p. 240): "We are not impressed by the argument that law enforcement methods such as those under review are necessary to uphold our laws. The Constitution proscribes such lawless means irrespective of the end. And this argument flouts the basic principle that all people must stand on an equality before the bar of justice in every American court. Today, as in ages past, we are not without tragic proof that the exalted power of some governments to punish manufactured crime dictatorially is the handmaid of tyranny. Under our constitutional system, courts stand against any winds that blow as havens of refuge for those who might otherwise suffer because they are helpless, weak, outnumbered, or because they are nonconforming victims of prejudice and public excitement. Due process of law, preserved for all by our Constitution, commands that no such practice as that disclosed by this record shall send any accused to his death. No higher duty, no more solemn responsibility, rests upon this Court, than that of translating into living law and maintaining this constitutional shield deliberately planned and inscribed for the benefit of every human being subject to our Constitution—of whatever race, creed or persuasion." It is much better for society that an accused should go free, than for our criminal processes to be polluted by prosecutions founded on prejudice against and hatred for the political beliefs of the accused.

This defendant was precluded from proving the very facts which, if proved to the satisfaction of a jury, would have demonstrated that he had been deprived of equal protection. The offers of proof here went to both elements required under the law. This error justifies a reversal.

It is my belief that, as a matter of law, the evidence is insufficient to sustain the conviction of perjury. Moreover, even if the evidence is technically sufficient, reversible error was committed in excluding the very evidence upon which the accused was dependent to prove a violation of his constitutional rights.

Appellant's petition for a hearing by the Supreme Court was denied July 22, 1943. Gibson, C. J., Traynor, J., and Schauer, J., voted for a hearing.